IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TATTLETALE PORTABLE ALARM SYSTEMS, INC., | : : : | |
| Plaintiff, | : : | Case No. 2:14-cv-00574 |
| v. | : : | JUDGE ALGENON L. MARBLEY |
| MAF PRODUCTIONS, INC., | : : | Magistrate Judge Jolson |
| Defendant. | : : | |

**OPINION & ORDER**

Before the Court is Defendant MAF Productions, Inc.'s ("MAF") Motion for Summary Judgment (Doc. 40) on Plaintiff Tattletale Portable Alarm Systems, Inc.'s ("Tattletale") First Amended Complaint (Doc. 22). This is a single-claim,[1] breach-of-contract diversity case concerning a sales video featuring William Shatner. For the reasons that follow, the Court **GRANTS** the motion.

**I. BACKGROUND**

MAF is a Malibu, California-based company that specializes in using the likeness and fame of actor William Shatner to promote businesses and their products. (First Am. Compl., Doc. 22, ¶ 2.) Tattletale is an Ohio-based corporation that has billed itself since the mid-1990s as the world's only portable wireless alarm system. (*Id.*, ¶¶ 1, 5.) Tattletale hired MAF to produce a spot for the show "Moving America Forward," a series on the video-streaming website YouTube about how businesses promote their products and brands. (*Id.*, ¶ 7.) The video was an interview-style infomercial featuring Shatner and Brian Hess, Tattletale's CEO and alarm inventor. (*Id.*)

---

[1] In its Amended Complaint, Tattletale dropped its initial claim for fraudulent misrepresentation. (*See* Docs. 21, 22.)

1

Tattletale alleges that MAF hired a click farm after posting the video. (*Id.*, ¶ 8.) A click farm is a group of low-paid workers hired to click links to inflate the view counts of websites or videos. (*Id.*, ¶ 8 n.1.) YouTube registered nearly 38,000 views within two weeks after the video was posted. (*Id.*, ¶ 8.) Tattletale later saw the YouTube Video's view-count data and was encouraged by its apparent popularity. (*Id.*, ¶ 10.)[2]

Before seeing that data, on February 13, 2013, TattleTale and MAF contracted for MAF to "write, produce, and direct a video . . . approximately 10 to 20 minutes in length to be used [ . . . ] for the purpose of giving said video to . . . [sales] reps to aid them in the sale of TattleTale's product" (the "Video," or the "Sales Video"). (02/13/2013 Agreement (the "Agreement"), Pl.'s Ex. A, Doc. 22-1.) The terms of the Agreement forbade Tattletale's use of the Sales Video as a "television commercial," but permitted Tattletale's use of it over the internet "to recruit direct[-]to[-]consumer salespeople." (Doc. 22-1, ¶ 8.) Parties modified the Agreement on March 6, 2016 (the "Modification"), and on March 21, 2016, parties agreed to an amendment of the Agreement (the "Amendment").[3] (Tenzer Decl., Doc. 40-1, ¶ 5; *see id.*, Ex. 1-C.)

Tattletale linked to the Sales Video on its website, http://www.tattletale.com, immediately next to capitalized, bold text that read "Join the Tattletale team and start making money today! Sign up to become a Tattletale affiliate Now!" (Doc. 22, ¶ 14.) MAF sent a cease-and-desist letter to Tattletale telling it that its use of the Sales Video violated the Agreement, and demanding Tattletale remove the Video. (*Id.*, ¶ 16.)

On November 12, 2013, Scott Tenzer, Production Manager of MAF, discovered that Tattletale had also isolated screenshots of Shatner from the Sales Video and used those images to

---

[2] Tattletale's inclusion of this information in its Amended Complaint seems misplaced, considering it is no longer pursuing its claim for fraudulent misrepresentation.
[3] "Agreement" also refers to any operative contractual language between Tattletale and MAF unless specified by referring to the Amendment or Modification.

2

advertise its alarms to the public. (Pl.'s Ex. 1, Tenzer Decl., Doc. 40-1, ¶ 20.) That same day, Tenzer discovered that Tattletale used Shatner's image in other advertising. (*Id.*, ¶ 21.) On December 16, 2013, Tenzer emailed Tattletale demanding it take down ads featuring Shatner. (*Id.*, ¶ 22.) On December 20, 2013, Tenzer learned that Tattletale had not only refused to take down the offending ads but had also used Shatner's image in coupons for alarms. (*Id.*, ¶ 23.) Ruth Collins, Tenzer's assistant, discovered articles describing Shatner as a "spokesperson" for Tattletale. (Pl.'s Ex. 2, Collins Decl., Doc. 40-2, ¶ 4.) On December 20, 2013, Collins sent an email to Tattletale expressing her disappointment that Tattletale had not removed from its website the Shatner images and the reference to him as a "Tattletale spokesperson." (Collins Decl., Doc. 40-2, Ex. 2-B.) Ultimately, Tattletale acquiesced to MAF's demands, removing the video from its website in June of 2014, just before initiating this lawsuit. (Doc. 46 at 11.)

At the time of filing its Amended Complaint, Tattletale had paid MAF $475,000.00 for rights to the Sales Video. (Doc. 22, ¶ 18.) Tattletale further agreed to pay MAF an additional $350,000.00 upon selling 4,000 units of its alarm product, and a $35 royalty for each alarm system unit sold during the term of the Agreement. (*Id.*, ¶ 19.)

Tattletale contends that MAF's demand to remove the Sales Video was a breach of the Agreement, and that the repercussions to Tattletale from complying with MAF's demand entitles Tattletale either to damages of more than $75,000.00 or to an Order rescinding the Agreement, and returning all money Tattletale paid for rights to the Video. (*Id.*, ¶ 20.)

## II. STANDARD

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might

affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The necessary inquiry for the Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). Although the evidence must be viewed in the light most favorable to the nonmoving party, *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013), the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

### III. ANALYSIS

To prevail on its claim for breach of contract Tattletale must prove by a preponderance of the evidence that: (1) a contract existed; (2) Tattletale fulfilled its obligations; (3) MAF failed to do so; and (4) damages resulted from MAF's failure. *Kehoe Component Sales Inc. v. Best Lighting Prods.*, 933 F. Supp. 2d 974, 994 (S.D. Ohio 2013) (quoting *Anzalaco v. Graber*, 970 N.E.2d 1143, 1148 (Ohio App. 8th Dist. 2012)). In interpreting the Agreement, the Court's role is "to give effect to the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). To that end, the Court will examine the Agreement holistically, and presume that the document reflects each party's intent. *See id.* The Court may examine extrinsic evidence to ascertain intent, but it may do so "[o]nly when the language of a contract is unclear or ambiguous." *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992). Such

4

ambiguity exists "[o]nly when a definitive meaning proves elusive." *State v. Porterfield*, 829 N.E.2d 690, 692 (Ohio 2005).

At issue here are the second and third prongs of the breach-of-contract inquiry, and the legitimacy of Tattletale's claim for relief fundamentally. As to the third prong, MAF argues that it is entitled to summary judgment because it has fully performed its obligations under the Agreement and Tattletale cannot identify any provision of the Agreement that MAF has violated. As to the second prong, MAF argues that Tattletale has failed to perform its obligations under the Agreement by failing to furnish MAF royalties and accounting statements. As to Tattletale's theory generally, MAF contends that there is no factual or legal basis to support Tattletale's claim for relief. This Opinion and Order discusses the issues in turn.

### A. MAF's Performance

It is axiomatic that a plaintiff must demonstrate a failure of performance on the part of the defendant to maintain a suit for breach of contract. This is to say that a plaintiff's claim will fail as a matter of law where "reasonable minds [can] only conclude that [the defendant] performed its obligations under the contract." *Mohan Jain v. Omni Publ'g Co., Inc.*, No. 92121, 2009 Ohio App. LEXIS 4416, at *P21 (Ohio App. 8th Dist., Oct. 1, 2009) (citing *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio App. 10th Dist. 2007) ("In order to prove a breach by the defendant, a plaintiff must show that the defendant 'did not perform one or more of the terms of the contract.'") (quoting *Little Eagle Prop. v. Ryan*, Franklin App. No. 03AP-923, 2004-Ohio-3830, 2004 WL 1607045, at *4 (Ohio App. 10th Dist., June 30, 2004))).

The Agreement's explicit terms as to MAF's obligations are:

1. Services to be performed by MAF.
    a. MAF will write, produce and direct a video approximately 10 to 20 minutes in length to be used exclusively for the purpose of recruiting sales reps to sell tattletale's home product to consumers and for the purpose of giving said

5

      video to the reps to aid them in the sale of tattletale's product. MAF will provide William Shatner as the star of said video. His role will be that of a man who receives a box from tattletale that contains a new secret weapon to protect him and his family and William Shatner believes it is a gun and angrily returns the box unopened to tattletale and tattletale has the opportunity to explain to William Shanter [sic] that it's not a gun but instead it is tattletale's wireless portable alarm system and Shatner ends up happy to take it home.

      b.  All costs for the production of the above described video will be paid for by MAF.

      c.  The location for the videotaping will be somewhere in the Los Angeles area and the date and time of the taping will be set at the convenience of both parties. . . .

      4.  Should MAF fail to obtain the services of William Shatner as described above within 30 days from the date of this agreement, this agreement will be terminated with written notification from MAF and the $75,000 escrow payment shall then be returned by MAF at such time of notification. . . .

(Ex. A, Doc. 22-1 at 2.)

MAF argues that "Tattletale . . . can[not] even identify a provision of the [Agreement] that MAF has not complied with. MAF performed all of its obligations under the [Agreement] and Tattletale has not identified a single contractual provision that MAF violated or failed to perform." (Doc. 40 at 12.) Indeed, nowhere does Tattletale point to any provision of the Agreement that MAF has violated. The Amended Complaint's only allegation as to a violation of the Agreement by MAF is that "Defendant has materially breach the Agreement by, among other things, attempting to deny plaintiff the right to use the Shatner Sales Video on its website and internet [sic] to recruit sales representatives." (Doc. 22, ¶ 28.) Tattletale argues in its Opposition to this motion for summary judgment that "[t]he explicit purpose of the Agreement was for MAF and William Shatner to produce a 'video to market Tattletale's wireless burglar alarm system for homes via direct[-]to[-]consumer sales.'" (Doc. 46 at 13) (quoting Hess Aff., Doc. 46-1, ¶ 22-23.) According to Tattletale, MAF's conduct was contrary to that purpose, and "MAF has clearly and materially breached the parties' agreement by, among other things, interfering with

6

Tattletale's the right [sic] to use the video on its website and internet [sic] to recruit sales representatives." (Doc. 46 at 4.) But nowhere does Tattletale point out a specific provision of the Agreement that MAF has violated.

MAF avers that "[a]fter the Contract was signed, MAF wrote, produced, and directed the Recruiting Video in accordance with the Contract." (MSJ at 13) (citing Tenzer Decl., ¶¶ 9-14, Exs. 1-E-J.) Namely, "William Shatner stars in the Recruiting Video, the script follows the storyline as detailed in the Contract; MAF paid for the production of the Recruiting Video; and the Recruiting Video was taped in Los Angeles," (*Id.* at 13-14), which seems to fulfill its obligations. Tattletale counters that MAF's "obligations under the . . . Agreement [did] not end upon completion of the Shatner Sales Video," and that "[MAF] had to produce a video of a certain quality, which it did not do. The . . . Agreement contemplates more than simply the *creation* of a video, but also includes the necessary corollary that Tattletale can *actually use* the video." (Doc. 46 at 17.) According to Tattletale, it "could not actually use the video due to its poor-quality [sic]." (*Id.*)

At oral argument on this motion, Tattletale advanced a theory that the Video's poor quality constituted MAF's violation of the covenant of good faith and fair dealing.

> MR. RICHARDS: What the contract required was the production, direction and providing of a video that's 20 minutes in length, and one of our claims is the video you provided wasn't—didn't meet the necessary standards. And what we're basing that claim on is the implied covenant of good faith and fair dealing that's in every contract. It requires good faith not only execution but performance of the contract.
>
> THE COURT: Mr. Richards, was that claim in your amended complaint?
>
> MR. RICHARDS: It is, Your Honor. Now, we don't use the word good faith and fair dealing but we certainly allege the factual predicate for that.
>
> THE COURT: So factually you're alleging in the amended complaint that the video was of poor quality.

7

> MR. RICHARDS: Here is what we say in the amended complaint. Our amended complaint is focused on the fact that they precluded us from using the video in a manner that is expressly allowed for under the contract. That's our key claim. We also, in other instances, say they breached it for among other reasons and then we specify our key reason. And then in the counterclaim we identify the other reasons.

In its Amended Complaint Tattletale in fact does not allege predicate facts supporting its theory that MAF violated the covenant of good faith and fair dealing by furnishing a poor-quality video. The Amended Complaint includes no hint that the Video was of poor quality, which makes sense because the basis for Tattletale's breach theory is that MAF thwarted its use of the Video, which presupposes that Tattletale *wanted to* and *could* use the Video *as was*. There would be no reason to complain if MAF were preventing Tattletale from using an unusable video. (*See* Doc. 46 at 9.)

Even if Plaintiff had alleged facts sufficient to predicate a covenant-breach claim, Ohio law recognizes no standalone cause of action for a violation of the covenant of good faith and fair dealing. *McCubbin v. BAC Home Loans Servicing, L.P.*, No. 2:11-cv-547, 2012 WL 140218 (S.D. Ohio, Jan. 18, 2012) (citing *Lakota Local Sch. Bd. of Educ. v. Brickner*, 671 N.E.2d 578, 584 (Ohio App. 6th Dist. 1996) (noting that "good faith is part of a contract claim and does not stand alone.")). Insofar as Tattletale pursues a standalone claim for a breach of the covenant of good faith and fair dealing, that claim fails.

Because Tattletale has not pointed to any portion of the Agreement that MAF has violated, the Court **GRANTS** Defendant's motion for summary judgment.

### B. Tattletale's Performance

As to the second prong of the breach inquiry, "[i]t is well established under Ohio contract law that a party must comply with all express conditions to be performed in case of breach before it can claim damages by reason of the breach." *Au Rustproofing Ctr., Inc. v. Gulf Oil*

8

*Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985) (citing *Bell Bros. v. Robinson*, 28 Ohio C.D. 160, 164 (Ohio App. 6th Dist. 1916) ("[I]f the contract provides conditions to be performed by the [plaintiff] in case of a breach, the [plaintiff] must comply with such conditions before he can claim damages by reason of the breach.")).

MAF argues that it is entitled to summary judgment because Tattletale has failed to perform its obligations under the Agreement by failure of payment and accounting. Pursuant to section 2.a of the Contract, Tattletale was obligated to "pay MAF $35 for each product Tattletale sells during length [sic] of this agreement. Said payments shall be paid monthly accompanied by an accounting statement." (Doc. 22-1 at 2.) Section 2.b provides: "Tattletale shall send to MAF a check each month for royalties due MAF accompanied by an accounting statement based on that month's sales and the royalties due." (*Id.*) According to MAF, "Tattletale has never provided MAF with a monthly accounting statement, and Tattletale has never paid a single dollar to MAF pursuant to the royalty provision in the Contract." (Doc. 40 at 15) (citing Tenzer Decl., Doc. 40-1, ¶¶ 25-26.)

Tattletale advances two arguments on this point: (1) that MAF breached the Agreement first, excusing Tattletale's future performance; and (2) even if MAF had not breached the Agreement, Tattletale was nonetheless excused from performing its payment and accounting obligations because the Agreement limited royalties and accounting only as to units sold by sales representatives connected with the Sales Video, of which there was none.

As to the first argument, Tattletale is correct to say that MAF's breach of the Agreement would excuse Tattletale's future performance under the same. *See Waste Mgmt., Inc. v. Rice Danis Indus. Corp.*, 257 F. Supp. 2d 1076, 1084 (S.D. Ohio 2003) ("Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when

9

the party for whose benefit the condition operates has already materially breached the contract.") (citing *Midwest Payment Sys., Inc. v. Citibank Fed. Sav. Bank*, 801 F. Supp. 9, 13 (S.D. Ohio 1992)). On this point Tattletale repeats its theory of MAF's breach, namely that "by demanding Tattletale remove the Shatner Sales Video from its website, MAF breached the . . . Agreement." (Doc. 46 at 21.) But because the Court finds that MAF's demand of Tattletale to remove the Video did not breach the Agreement, as discussed in greater detail in pt. C, *infra*, Tattletale does not prevail on this point of the inquiry. Further, even if MAF's demand to remove the Video were breach, it occurred no earlier than December of 2013. (*See* Tenzer Decl., Doc. 40-1, ¶ 22.) And because Tattletale sent MAF no accounting statements or royalties from February of 2013 until then, if it sold units governed by the royalty and accounting terms of the Agreement, Tattletale would have failed to perform its obligations well before MAF breached.

As to its second point, Tattletale interprets the Agreement's royalty provision to mean that royalties are due only for alarm units sold by sales representatives in connection with the Shatner Sales Video. (Doc. 46 at 19) ("[T]he Second Agreement *only* contemplated additional payments to MAF *if* Tattletale sold consumer units as a direct result of the sales representatives obtained through the Shatner Sales Video or dealer program".) Because no units have been sold through any sales reps, Tattletale contends it has no obligation to report to MAF. (Doc. 46 at 19.) MAF interprets the Agreement more broadly to mean that it was owed royalties and accounting for each sale made directly to a consumer, full-stop. (Doc. 49 at 12.)

The plain language of the Agreement and Amendment supports MAF's interpretation. The Agreement obligates Tattletale to "pay MAF $35 for each product Tattletale sells." The Amendment provides:

> Tattletale shall have the right to sell Tattletale's wireless home alarm system to retail dealers. The royalty of $35.00 per sale set forth in the 2/13/13 agreement

10

>    shall apply only to home sales and the royalty paid to MAF for retail dealer sales shall be $5.00 per system sold to the dealer.

(Tenzer Decl., Doc. 40-1, Ex. 1-C.) Nowhere in the Agreement or Amendment is there language setting forth (or even relating to) a condition that the only units Tattletale had to report were ones sold by sales representatives connected with the Video.

It cannot point to express contractual language to support its position, so Tattletale instead cites Tenzer's deposition testimony:

>    Q.    **So my question is, is what your understanding is. And is it your understanding that the check was supposed to be delivered to MAF each month in connection with the monthly sales the affiliates of Tattletale sold of the consumer units?** [sic]
>    [ . . . ]
>
>    THE WITNESS: Yeah, I'm not -- I'm not sure what you're -- what you're -- what you're getting at.
>
>    Q.    **This contract's related to the sale of consumer units; right?**
>
>    A.    Yeah. They were -- they were selling consumer units, the sales reps, were supposed to, if they hired the sales reps.
>
>    Q.    **And this contract sets forth a royalty that MAF will receive in connection with those affiliates, the sales reps, selling the consumer units; right?**
>
>    A.    The sales reps, yeah, exactly.

(Doc. 46 at 19) (citing Tenzer Depo., Doc. 45 at 124:22-125:17.) But this testimony reveals nothing material. It is undisputed that units sold by sales reps would have to be reported—in dispute is whether *only* those sales would have to be reported. Tenzer's later deposition testimony reveals that he believed Tattletale was obligated to pay royalties and provide accounting for sales other than those made by sales reps connected with the Video. (*See* Tenzer Depo., Doc. 45 at 224:6-10) ("**Q: Is it your testimony that regardless of whether or not a sale**

11

**was connected to the affiliate program, the MAF was entitled to a royalty on that product?** A: Yes.".)

But even if Tattletale correctly characterized Tenzer's testimony, and even if Tenzer's testimony unambiguously supported Tattletale's interpretation of parties' relevant agreements, the Court could not rightly examine Tenzer's testimony before finding that language at issue in the Agreement is ambiguous. *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011) (in interpreting a contract, a court's role is "to give effect to the intent of the parties" and, to that end, a court will "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract."); *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992) (a court may examine evidence outside the terms of a contract "[o]nly when the language of [the] contract is unclear or ambiguous."). And a contract term is not ambiguous simply because parties disagree about its meaning. *See Shifrin*, 597 N.E.2d at 501. If that were the case, the initial analysis of contractual language would be a pointless exercise in any dispute over contract interpretation. Tattletale has not alleged that any relevant language is ambiguous, and the Court may not *sua sponte* read ambiguity into a contract. *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669, ¶ 16 (Ohio 2008) (citing *Hacker v. Dickman*, 119 N.E. 2d 1005, 1006 (Ohio 1996)). As such, the Court will not venture outside the terms of the Agreement to resolve disputes concerning the interpretation of its terms.

Because no ambiguity has been established (or even alleged), and because the plain language of the agreements seems to support MAF's position, the Court is inclined to find MAF's interpretation prevailing as a matter of law, and would thus grant Defendant's motion for summary judgment on this ground. But because this matter is still pending in Defendant's Counterclaim, and because the Court grants Defendant's motion on two other grounds, discussed

in pt. A, *supra*, and pt. C, *infra*, the Court reserves judgment on this issue pending further discovery, briefing, and/or trial.

### C. Basis of Plaintiff's Theory

Finally, and most fundamentally, MAF argues that Tattletale's theory has no basis in law. Tattletale alleges merely that MAF breached the Agreement by demanding that Tattletale stop using the Sales Video in a way MAF thought violated the Agreement. Specifically, Tattletale alleges that "[D]efendant has demanded and caused [P]laintiff to remove the . . . Sales Video from its website in breach of the Agreement," which has rendered the Sales Video "essentially useless." (Doc. 22, ¶¶ 25, 27.)

Prior to this case, the Court had never considered the question of whether a party may recover damages for voluntarily complying with a demand letter. This is unsurprising because if Tattletale believed that its use of the Sales Video did not violate the Agreement, then the Court would expect Tattletale to continue to use the Sales Video as it deemed fit and either sue for declaratory relief or wait for MAF to sue for breach. The Court has found only one case similar to this, from the Middle District of Tennessee. In *Columbia Gulf Transmission Co. v. McCann*, an energy company obtained easements to transport natural gas through the defendants' property. No 1:11-cv-0091, 2011 WL 6016833, at *1 (M.D. Tenn. Dec. 2, 2011). Thereafter, the defendants used the property in a way that the plaintiff thought interfered with its rights under the easements, so the plaintiff issued the defendants a cease-and-desist letter demanding they stop interfering. *Id.* at *3. Dissatisfied with the defendants' response, the plaintiff sued the defendants, and the defendants countersued, alleging that the plaintiff's cease-and-desist letter breached their rights under the easements because it "unreasonably interfered with [the defendants'] right to use and enjoy their property." *Id.* at *2. That claim was dismissed because

13

the court found that defendants "failed to allege any actual deprivation to their right to use and enjoy their property," and it thus concluded that the defendants could not state a claim for breach of the terms of the easements. *Id.* at *3.

Plaintiff likewise fails to demonstrate any actual deprivation of its rights under the Agreement by MAF. Indeed, there is no record evidence of any actual interference with Tattletale's rights. By Tattletale's own account, MAF's only wrongdoing was demanding that Tattletale stop using the Sales Video in a way that MAF thought violated the Agreement. A party to a contract demanding that another party perform its obligations is a legitimate (and expected) activity if the party believes the other is not performing. Plaintiff has presented no authority or reason for the Court to find Tattletale's theory a cognizable claim under contract law. Indeed, Tattletale has failed entirely to counter MAF's argument concerning the soundness of the legal basis of its breach theory.

Because the Court finds no legal or factual basis for Tattletale's claim for relief, it **GRANTS** Defendant's motion for summary judgment.

## RECOMMENDATION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. Plaintiff's Amended Complaint is **DISMISSED with prejudice**.

**IT IS SO ORDERED**.

                                           **s/Algenon L. Marbley**
                                           **ALGENON L. MARBLEY**
                                           **UNITED STATES DISTRICT JUDGE**

**DATE: September 21, 2016**